## CARL HARRIS v. THE STATE.

### No. 1142. Decided January 17, 1912.

### Rehearing denied February 28, 1912.

**1.—Incest—Sufficiency of the Evidence.**

Where, upon trial of incest, the evidence sustained the conviction, there was no reversible error.

**2.—Same—Evidence—Confessions—Statutes Construed.**

Proof as to the execution of a confession is a matter that is always addressed to the court, and where the same is shown to have been signed and executed by the defendant as required by law, the same was admissible in evidence. Following Thomas v. State, 35 Texas Crim. Rep., 178, and other cases. Article 809, Revised Code Criminal Procedure.

**3.—Same—Evidence—Incriminating Testimony.**

Where, upon trial of incest, the alleged female refused to answer the questions whether she had sexual intercourse with the defendant and had a child thereby, on the ground that it would incriminate her, there was no error in the court's ruling that the questions might be asked in the presence of the jury, but that he would not require her to answer; besides, the bill of exceptions failed to point out the specific grounds of objection.

**4.—Same—Evidence—Bill of Exceptions.**

Where, upon trial of incest, the defendant sought to show that another was the father of the child of the alleged female, there was no error in permitting the State to show why the said other party married the said female when she was pregnant, so that the jury could determine whether this party was the father of the child.

**5.—Same—Evidence—Matters Drawn Out by the Defendant.**

Where the attorney for the defendant had asked a witness whether he remembered who made the complaint, there was no error in permitting the State's counsel on cross-examination to interrogate the witness on this matter; besides, the bill of exceptions was insufficient in not showing why the testimony was not admissible.

**6.—Same—Argument of Counsel—Bill of Exceptions.**

Where the argument of counsel was in reply to arguments of defendant's counsel, and no special charges were requested to withdraw the same from the jury, there was no error; besides, the bill of exceptions was defective.

**7.—Same—Additional Charge—Statutes Construed.**

Under article 754, Revised Code Criminal Procedure, the jury is expressly authorized after they have retired to ask further instructions, and where the court's charge complied with this statute, there was no error in refusing a requested charge on the same subject.

**8.—Same—Requested Charge—Practice on Appeal.**

Where no reason is given by the bill of exceptions or in the motion for new trial why a requested charge should have been given, there was no error; especially where the court had given a proper charge on the subject of confessions and corroboration.

**9.—Same—Definition of Corroboration.**

Upon trial of incest, the court is not required to instruct the jury what corroboration means or to define said term to the jury, as its meaning is generally understood.

**10.—Same—Requested Charge.**

Where a requested charge was clearly a comment· on the State's testimony, there was no error in refusing same.

**11.—Same—Charge of Court—Weight of Evidence.**

Where, upon trial of incest, the court refused to give defendant's charge that the birth of a child to the alleged female could not be considered as corroborating defendant's confession, there was no error. Following Barrett v. State, 55 Texas Crim. Rep., 182.

**12.—Same—Corpus Delicti—Sufficiency of the Evidence—Confession—Corroboration.**

Where defendant's confession was introduced in evidence upon trial of incest, it may be used to aid the proof of the corpus delicti, and if all of it together is sufficient to satisfy the jury of the truth of the charge beyond a reasonable doubt, the conviction must be sustained. Following Kugadt v. State, 38 Texas Crim. Rep., 694, and to other cases. ·

Appeal from the District Court of Wise. Tried below before the Hon. J. W. Patterson.

Appeal from a conviction of incest; penalty, two years imprisonment in the penitentiary.

The opinion states the case.

*R. E. Carswell* and *T. J. McMurray & Gettys,* for appellant.—Upon question of corpus delicti: Nolan ·v. State, 60 Texas Crim. Rep., 5, 129 S. W. Rep., 1108.

Upon question of making complaint before county attorney: Blocker v. State, 61 Texas Crim. Rep., 413, 135 S. W. Rep., 130; Cain v. State, 18 Texas, 387. .

*C. E. Lane,* Assistant Attorney-General, for the State.

PRENDERGAST, JUDGE.—On December 3, 1910, appellant was indicted for incest with his sister, Janie Harris, alleged to have occurred on or about January 15, 1910. He was tried January 12, 1911, convicted and his punishment fixed at two years in the penitiary.

The proof shows that W. C. Harris, sixty-seven years old, ˙for several years prior to the commission of this offense, lived on a farm .in Wise County with his unmarried brother, fifty-three years old, and his four children—three sons, Ira, age twenty-three; Lucien, age twenty-one; Carl, the appellant, age nineteen, and his daughter, Janie, afterwards Mrs. Janie Brown, seventeen years of age. These were the ages at the time of the trial. The house they lived in had six rooms, two,· his kitchen and dining-room, an ell on the ground floor, and four other rooms, two on the ground floor and two on a second story above them. During the years of 1909 and 1910, till in September, the father and his brother slept together in one of the ground floor rooms in which the stairway was situated. Janie slept in the other ground floor room alone. Said three sons slept in the two rooms of the second story. Sometimes two of the brothers slept in

one room and one in the other. They changed about. The evidence shows, however, that Carl occasionally, if not frequently, slept in one of the rooms alone, the other two brothers sleeping in the other room together. In order for either of the brothers, at night, after all had retired, to have had access to Janie's room it would be necessary to come down the stairway in the father's and his brother's room, through it into her room.

In September, 1910, the father and his brother and his three sons became aware of the fact that Janie was pregnant. The father during this month is shown to have discussed this fact with Carl, but with neither of his other sons, or his brother. During January and February, 1910, Ira was shown to have worked at a gin in Decatur, some six miles distant from his home, as many as two days or more each week, staying at his father's with the family during these months while he was not thus at work in Decatur. Lucien, the other son, was shown to have gone to Fort Worth to school in June, 1910, and remained there thereafter either at school or working as a stenographer. He did not testify upon the trial. It does not appear whether he was present attending the court at the time of the trial or not.

The father testified on the trial that he had never at any time had sexual intercourse with his daughter Janie. While Ira testified on the trial to many facts when asked if he had ever had sexual intercourse with Janie, refused to testify because it might incriminate him. The uncle of the girl, the brother of her father, testified that he at no time had ever had sexual intercourse with Janie. Carl, the appellant, did not testify at all on the trial.

Janie was shown to have attended school in 1909, and on one or two occasions accompanied some young men from her home during that year to some party or other gathering in the neighborhood. The evidence in no way tends to show and it seems was not contended that she at any time had had intercourse with any of these persons with whom she had occasionally gone, except Joe Brown. Joe Brown was a boy living a few miles from the Harris family. He also attended the same school with Janie in 1909; they were then sweethearts, and in the fall of 1909 became engaged to be married. He occasionally went with her to some gathering and was with her occasionally during 1909 and in 1910. He was devotedly in love with her, and she, apparently, with him. In September, 1910, Janie's pregnancy became known. At this time Ira was staying in Decatur at work—was not at home. Lucien was in Fort Worth and had been continuously for months. Some time during September—on Wednesday before they left the following Sunday night to get married—Janie told Joe Brown, her sweetheart, and to whom she was engaged, that she was pregnant and then told him who was the father of the unborn child. Joe Brown, at this time, did not know and thought her condition was unknown to others. Because of his

devoted love for her and in order to protect her, he agreed to take her away from there and marry her. It was arranged between the father, the girl, Carl and Joe Brown that on the night of September 25, 1910, Carl would quietly and secretly take her from home in his buggy, pick up Joe Brown a mile or two therefrom on the road to Decatur, a railroad point, and that Joe Brown and she would take the night train to some point outside of the State and marry. Joe Brown had but one dollar and fifty cents in money. In June, 1910, the father had borrowed from Carl fifty dollars in money to send Lucien to school in Fort Worth. Whether he used the money for that purpose is not made clear. However, on September 24, 1910, the father repaid Carl the fifty dollars Carl had loaned him and upon the suggestion of the father it was agreed between Carl and him that Carl would give to Janie this money to go away on and marry Joe Brown, which Carl did. The fact that it was Carl's money and that he gave it to his sister for the purpose stated is not disputed. She had no other money except this. When Carl took his sister and Joe Brown to the train at night, as above stated, he drove directly to the depot for them to take the train—stopped a little distance from the train. Before they got to Decatur on this occasion, doubtless on that day, Carl had procured two railroad tickets—one to Wichita Falls and the other to Vernon. The purpose of this was that if anyone found out Joe and Janie had left on that train they would find that one went to one place and the other to the other. When they got to the depot the train was just then pulling in and they hastened to and got upon the train. Both went to Vernon. Before reaching there they concluded that they would go to Frederick, Oklahoma, which they did, and they were married there the next day, September 26, 1910. Just a few days after that Joe Brown's brother went to Frederick, found Joe and his wife and had a conference with him. Joe then saw his wife. They all three then returned to Decatur, in Wise County. The night of September 26, 1910, when they took the train and left Decatur was Sunday night. They started back to Decatur from Frederick, Oklahoma, on Friday night of the same week they were married and reached Decatur early Monday morning and then they all went first to the jail and then to the courthouse and saw the county attorney of Wise County, Mr. Ratliff. Joe's wife, his brother, mother and father, and brother-in-law and Mr. Branch, the sheriff, were all in the room of Mr. Ratliff, the county attorney, on that Monday morning. Joe Brown testified that he had never had sexual intercourse with Janie prior to his marriage to her. After leaving Decatur on this occasion, Joe Brown and his wife Janie went from there to Fort Worth and remained there, living with her as his wife until about a week before Christmas, 1910, when they separated, she going back to her father's and he to his. While they were living together on November 10, 1910, a child was born to Janie.

On Saturday, September 24, 1910, Janie's father and his brother went to Fort Worth. Ira was in Decatur and did not then know that Carl was to take Janie and Joe Brown to Decatur to take the train that night and he did not at the time they left know that they were going, or that they were then going to marry. From all the evidence on this point, we take it that the father and his ·brother were making it a point not to· know where Janie and Joe Brown were to go to be married, though they knew that Carl was to· take Janie and Joe to the train that night, furnish his sister this money and the tickets, but that Ira, the other brother, did not know of these details at the time.

Janie Harris Brown, appellant's sister, testified on the trial. She told who her father and brothers were, the situation of their house, the beds, the rooms and, among other things, said: "I believe he (Carl) slept on the east side; brother Ira slept on the west side, and when Lucien was at home he slept with Ira. Most of the time Ira and Lucien slept on the west side and Carl on the east side. The east side was just over my room, but there was no opening between them." She further testified: "In June (1910), I left Wise County and went to my sister in Donley County. I believe it was the 17th of June that I left, and returned along about the first of August." In speaking of returning to Decatur, the week she was married in Oklahoma, she said: "I came back to Decatur; I came back along about the last of September. I saw Mr. Ratliff, the county attorney, at that time ·at Decatur. Being now asked if I talked to him, I refuse to answer anything that might criminate myself." She further testified that she told her sweetheart, Joe Brown, that she was pregnant on the Wednesday before her brother took her and him to the train on the following Sunday night and that her brother Carl gave her the fifty dollars at their home before he took her that night; that there was no one present when he gave her the money and she did not remember just what was said. "I could not say positively, but I don't believe my brother (Carl) told me what to do . with the fifty dollars when he gave it to me. I asked him for the fifty dollars. I don't remember positively whether I told him what I wanted it for or not." She was then asked whether the appellant had sexual intercourse with her about the last of January or first of February, 1910, and she refused to answer because she might criminate herself. She was also then asked if she had a conversation with Mr. Ratliff (county attorney) when she came back to Decatur soon after the marriage. She refused to answer that because it might criminate her. She said, however, that her husband, Joe Brown, was with her when she was ·at Decatur at that time.

Ira Harris testified also on the trial. He told about how the family lived, the situation of the house and the rooms and how they all slept therein and that he was at Decatur one or two days each week during January and February, 1910, and when asked if he had

had sexual intercourse with his sister Janie in January or February, 1910, said: "I will not answer because I have been bothered right smart in this case and don't care to answer anything, and don't answer anything that might criminate some feeling towards me, some discourtesy. I said that *might*. I don't want to answer anything they would use towards me." Then for the same reasons he refused to answer whether he had had intercourse with his sister at any time in 1907, 1908 or 1909. He further stated that he was in Decatur on the night of September 25, 1910, when his brother Carl carried his sister and Joe Brown to the train and they left. He said: "My brother did not tell me he was going to carry his sister off to marry Joe Brown, nor that he was going to give her fifty dollars to leave on. I never had any consultation with my family concerning that matter, in which my brother was present. I did not know she was going to marry Joe Brown at that time." He first learned that she was engaged to Joe Brown in April, 1910.

The county attorney of Wise County, L. D. Ratliff, testified for the State, on direct examination: "I first saw, some time in the month of September, 1910, the paper now shown me (this was the alleged confession of Carl Harris); it was signed by Carl Harris. I saw him sign it."

On cross-examination he testified: "This paper was signed in my office. I think Mr. Dave Simpson was present, and a gentleman named Lilly, who lives out towards Greenwood; and I think Mr. Workman was present. The defendant was present. I am not sure, but I sort of believe Tom Greer, the justice of the peace, was present. The defendant had then been in my office, I suppose, about fifteen or twenty minutes; as long as it took me to write this portion in pencil. The other portion was written that morning, about the time the warrant was written. I had that ready."

The confession above identified by Mr. Ratliff was then introduced in evidence by the State. It is as follows:

"State of Texas,
County of Wise.

"Know all men by these presents: That I, *Carl Harris,* of the county and State aforesaid, being charged in the Justice Court here in Decatur with the crime of incest alleged to have been committed with my sister, Janie Harris, now Janie Brown, after being duly warned by L. D. Ratliff, county attorney of Wise County, Texas, *and to whom this confession is made,* first, that I do not have to make any statement at all; second, that any statement I may make can be used as evidence against me on the trial of the offense with which I stand charged, do of my own free will and accord make this confession of the crime with which I stand charged, the same being made without hope of reward.

"My name is Carl Harris; I am nineteen years old. Janie Harris

is my sister. I have had intercourse with her since we were children. The last time I had intercourse with her was in June, 1910. This was before she went West to see her sister. I had intercourse with her at first one place, then another. I know that she is pregnant now. I let my sister have $44 to marry Joe Brown on. I took them close to depot when they went to get married. I had my rig when I took them. I knew she was pregnant when she married Joe Brown. I do not deny the charge that my sister makes, and it is true.

Carl Harris.

"Witness:

    D. J. Simpson,
    W. S. Lilley."

(The underscored words in first paragraph of said paper were in ink writing; the remainder of said paragraph in typewriting; and all of the second paragraph, including signatures, was in pencil writing.)

We have not undertaken to give all of the evidence, but simply such a statement of it as will illustrate and show the questions raised and decided.

Besides a forcible oral argument when the case was submitted, the appellant's attorneys have filed a strong brief. There are quite a number of bills of exception to the admission of testimony and other questions, not presented in appellant's brief. We have considered all of them and deem none of them of sufficient importance to reverse the case or to require us to specially take them up and discuss them. We will take up, however, all of the questions presented by the appellant in his brief.

Appellant's first contention is that the evidence is insufficient to justify the verdict. In addition to all that is stated above, we have carefully gone over and considered the whole of it. In our opinion it amply sustains the verdict.

When the State offered the said confession of the appellant, copied above, the appellant objected to it on the following grounds: "It specifies no time or place or distinct transaction and is insufficient under the statute; and especially objected to the last sentence because it is a statement of a conclusion, indefinite and uncertain; states no facts; does not show the guilt of the defendant: 'I don't deny the charge that my sister makes, and it is true.'" The court overruled these objections, admitted the confession and appellant excepted.

The proof as to the execution of a confession is a matter that is always addressed to the court and not to the jury. Thomas v. State, 35 Texas Crim. Rep., 178; Speer v. State, 4 Texas Crim. App., 474; Carter v. State, 37 Texas, 362. The evidence of the county attorney, given above, and the confession which was shown to have been signed and executed by the appellant, clearly shows that it was admissible

in evidence. What effect it had was for the jury. That it was admissible in evidence under the proof, we have no doubt. It met all the requirements of the statute. Articles 809, 810 (new) Revised Code Criminal Procedure.

Next, appellant, by his bill No. 5, complains that while Janie Harris Brown, appellant's sister, was on the stand she was asked if she had a child. She had already testified at length about various matters as shown above. When she was asked this question, at appellant's instance the jury retired and she was heard then before the court and when then interrogated she stated that she would not answer whether she had a child or not, and that she would also refuse to answer whether she had had sexual intercourse with appellant on or about January or February, 1910, because her answer might incriminate her. The court then stated that if she refused to answer on that ground, he would not compel her to answer, but would permit these questions to be asked her before the jury. When the jury returned she was still on the stand, and these questions were then asked her and she declined to answer as stated above, and the judge did not require her to answer. The appellant excepted to the ruling and action of the court in permitting said questions to be asked her in the presence of the jury, but stated no grounds of objections whatever. Allowing the bill, the judge qualified it by stating this as a part of the bill: "The witness had been asked several questions which she had answered before the one objected to, and in the opinion of the court, if the State was refused the privilege of asking the questions in the presence of the jury that they would infer that her testimony would have been against the State on this point." In our opinion there was no error by the court under the circumstances in permitting these questions to be asked the witness in the presence of the jury, and especially as no specific ground of objections was made by appellant.

The sixth bill presented by appellant is to this effect: That after Joe Brown, a witness for the State, testified on reexamination, after being cross-examined by the defendant, said: "My brother came to the house where I was boarding in Oklahoma between ten and twelve o'clock and we walked around a few minutes before noon. Then I saw my wife at noon." He was then asked by the State: "Did she go before an officer?" This was objected to by defendant as immaterial and not binding on the defendant and can not effect the question of his guilt or innocence. The jury being withdrawn, the witness stated his reasons for marrying Janie Harris, and the State proposed to introduce such statement before the jury to show his reasons for marrying her. "The defendant objected to the same as hearsay, immaterial and irrelevant and subject to every objection that Greenleaf or anybody ever wrote about; which objections the court overruled and upon the return of the jury into court the witness repeated his reasons for marrying Janie as follows:" "I was

engaged to her and loved her, at that time, with all my heart, and thought she was pure and virtuous until she told me that"—(Here the defendant again interposed the above objection, which the court overruled, defendant excepting)—"She told me she was pregnant and she thought this would save her name, by me going off and marrying her that way, living with her until after the birth of her child, away from where we were known, and I did that, just merely to save her name, as I thought it would at that time; did not know it was known." The above is in substance and almost literally the said bill of exceptions, except the heading and the formal concluding part with the signature of the judge. This bill, in our opinion, is insufficient to require us to pass upon the questions attempted to be raised. (Conger v. State, 63 Texas Crim. Rep., 312, 140 S. W. Rep., 1112.) The record in this case discloses, with reasonable certainty, from the examination of the several witnesses about the relationship that had existed between Janie Harris and Joe Brown, after their engagement and the times and places that he was with her, that appellant sought to show to the jury that Joe Brown had been having intercourse with her before he was married and that he and not the appellant was the father of her child, and, although Joe Brown testified that he had at no time prior to his marriage to Janie ever had sexual intercourse with her, the State was entitled to this proof by Joe Brown of the reasons why and the purposes that had actuated him in marrying her and living with her when he was told by her just before the marriage that she was pregnant, in order to give the benefit of this testimony to the jury so that they could determine whether or not he, Joe Brown, had had sexual intercourse with her and was the father of the child. Even if we could consider this bill of exceptions, in our opinion, the evidence was properly admitted and the court did not err in admitting it.

The next question presented by appellant is his ninth bill of exceptions, which, besides the proper heading and the signature of the judge, is in full as follows: "Be it remembered that upon the trial of the above styled and numbered cause L. D. Ratliff, upon the witness stand for the State, testified: "This woman (meaning Janie Brown) made a statement to me. She signed no complaint; no official complaint." He was then asked by the State: "Was she before you at the time the complaint was made?" and this and the above answer was objected to as hearsay and immaterial. The witness answered, before any ruling: "As far as that is concerned, she had gone downstairs." The objection was renewed, and overruled by the court with the statement that the defendant's counsel had gone into the matter. The record shows that Mr. Carswell, attorney for defendant, had asked witness Greer: "Do you remember who made the complaint?" and Greer had answered that he did not know.

"And the defendant then and there excepting to the ruling and action of the court, and now tenders this bill and asks that it be

approved and made of record in this case and it is done." This bill clearly is insufficient to require this court to consider it in that it is not full and explicit so that the matters presented to this court may be comprehended without recourse to inference, and it does not set out the proceedings in the court below sufficiently to enable us to know that an error, if an error, has been committed. From it we could not tell the state of the evidence of this or any other witness so as to show whether this evidence was or was not admissible; and the rule is that it can not be aided by the statement of facts. (Conger v. State, supra.)   It is not shown by the bill the state of the case, nor why this testimony was not admissible. The record shows that both Joe Brown and his wife Janie had testified, without objection, that she and he both were before the county attorney on this occasion, and as the matter is shown by the bill it was not hearsay, but so far as we can tell from it, a material independent admissible fact for the county attorney to state what this bill says he stated at the time.

Appellant's next complaint is shown by his bill No. 10. It is apparently to various expressions used by Judge Bullock, representing the State, in his closing argument to the jury. It is not presented in such way as to show any error whatever. It is contained in six typewritten pages and purports to be a portion of his speech. Here and there through it, in brackets, is simply the word ("exception"). Then there appears to be a colloquy between Judge Bullock and one or the other of the appellant's attorneys, giving and taking in their remarks to and of one another and of what Mr. Bullock was stating. Occasionally it is shown that Mr. Carswell would say: "We object to that." No ruling whatever by the court. Then again when Mr. Bullock would say something, Mr. Carswell would say: "I object." The Court: "Sustain the objection." Then again by Mr. Carswell: "We except to that." The Court: "All right." Then again by Mr. Carswell: "We except to that." The Court: "Gentlemen of the jury, you will disregard that part of the remarks of counsel." Besides this, the bill shows that Mr. Bullock was replying to arguments made on the various points by one or the other of appellant's attorneys when they addressed the jury. Upon the whole, it is our opinion, that this bill shows no reversible error whatever. No charge was asked by appellant to the jury not to consider any part of Mr. Bullock's speech.

The next is another bill No. 10 of appellant's, wherein it is shown this occurred: After the jury retired to consider its verdict it returned into court and propounded the following inquiry: "Does it make any material difference whether the confession was made before justice of the peace or the county attorney?" Whereupon the court gave the jury in response to said inquiry the following written special charge: "Gentlemen of the jury: In response to your question, as to whether or not it is material whether the confession was made

before the justice of the peace or county attorney, you are instructed that it is wholly immaterial before whom the confession was made (if made at all). A confession made before the county attorney, if made in the manner required by law, is just as legal as if made before the justice of the peace." The appellant objected to this because it was not the law, was upon the weight of the evidence and wholly ignored the question whether or not the confession was freely and voluntarily made by defendant and fully comprehending what he was doing and the terms of such confession. The appellant thereupon requested the court to give instead of the charge it did give, the following charge by him:

"You are instructed that while it is immaterial to whom a confession may be made, you are instructed that in order to be used as evidence against the defendant, such confession must be freely and voluntarily made by the defendant with a full understanding of its meaning, and if the fact that it was made to the county attorney in the manner disclosed by the evidence in any way in your judgment effects the question of whether or not it was freely and voluntarily made by the defendant, with the understanding upon his part of what it meant, then it would be material and you will not consider it as evidence against the defendant if you find that the fact that it was procured by the county attorney under the circumstances shows that it was not freely and voluntarily made by defendant with a full understanding of its meaning." To which action of the court in giving the charge it did give and refusing the special charge requested, appellant excepted.

Article 754 (new) Revised Code Criminal Procedure expressly authorizes the jury, after they have retired to ask further instructions of the judge touching any matter of law. Whereupon "the court shall give such instruction in writing, but no instruction shall be given except upon the particular point on which it is asked." The charge the court gave in this matter in reply to the question asked by the jury strictly complied with this statute and was an apt and correct legal answer thereto. It would have been improper for the court, instead of giving the charge it did, to have given the said charge requested by appellant.

Appellant's next complaint is that the court was asked to give and refused to give his special charge No. 3, then quotes such charge. No reason is given by this bill or in the motion for new trial why this charge should have been given. It is too general on that account to require us to pass upon it. However, the court had already given on this subject the following charge to the jury:

"The State offered in evidence a certain written paper claimed to be a confession made by the defendant, and on this subject you are given the following charge: that if you find the defendant did confess or admit that he had carnal intercourse with said Janie Harris, you are instructed that you can not convict him upon such confes-

sion unless you believe such confession to be true and further believe that such confession had been corroborated by other evidence, either direct or circumstantial, tending to show that the defendant did in fact have carnal knowledge of said Janie Harris." The evidence of corroboration was so strong and clear and practically without contradiction that the court was not required to give any other or further charge than it did on this subject.

Appellant next complains that the court refused to give his charge defining corroboration. This court has already held against appellant on this point. In Austin v. State, 51 Texas Crim. Rep., 327, the court said: "We do not believe the court was required to instruct the jury what 'corroboration' meant or to define said term to them; said word is not one of technical meaning, but is in ordinary use, and its meaning generally understood."

Neither did the court err in refusing to give appellant's special charge No. 8, telling the jury in effect that they could not consider as a circumstance corroborating appellant's confession, the evidence that appellant carried his sister Janie and Joe Brown to the depot, and that he gave her money and tickets at her request and that the money was given to him by his father with instructions to give it to her and that his only intention in taking them to the depot was to comply with her request and in giving her the money to observe his father's instructions. This charge was clearly a comment on the testimony and the court can no more do this against the State than it can against the appellant. The testimony was there to be considered by the jury for whatever it was worth without any comment or restriction thereof by the court.

Neither did the court err in refusing to give appellant's charge that the birth of a child to Janie could not be considered as corroborating appellant's confession. This fact, too, under the circumstances, was before the jury to be considered by them for whatever it was worth. (Barrett v. State, 55 Texas Crim. Rep., 182.)

Appellant contends that this case is on all-fours with Nolan v. State, 60 Texas Crim. Rep., 5, 129 S. W. Rep., 1108, and, as we understand his contention, it is that the corpus delicti in this case has not been sufficiently proven and that the evidence as a whole is insufficient to sustain a conviction. The Nolan case, supra, is nothing like this case so far as the facts of that compare with the facts of this case. It is true that this court has held and it is well established that a confession alone in and of itself is insufficient to support a conviction in a case of this character, or any other. It is needless to cite the authorities to that effect because they are uniform. But it is as firmly established by the decisions of this court that the confession may be used to aid the proof of the corpus delicti, and if all of it, together, is sufficient to satisfy a jury of the truth of the charge beyond a reasonable doubt, the conviction must be sustained. Kugadt v. State, 38 Texas Crim. Rep., 681; Jackson v. State, 29

Texas Crim. App., 458; Anderson v. State, 34 Texas Crim. Rep., 546; Gallegos v. State, 48 Texas Crim. Rep., 58; Gallegos v. State, 49 Texas Crim. Rep., 115; Lott v. State, 60 Texas Crim. Rep., 162, 131 S. W., 553; Attaway v. State, 35 Texas Crim. Rep., 403; Nicks v. State, 40 Texas Crim. Rep., 6; Tidwell v. State, 40 Texas Crim. Rep., 40; Sullivan v. State, 40 Texas Crim. Rep., 633; White v. State, 40 Texas Crim. Rep., 366; Landreth v. State, 44 Texas Crim. Rep., 239; Bradshaw v. State, 49 Texas Crim. Rep., 165; Austin v. State, 51 Texas Crim. Rep., 327.

In the Kugadt case, supra, the court through Judge Hurt said: "The general doctrine is that extrajudicial confessions, standing alone, are not sufficient proof of the corpus delicti; and some of the cases hold that the corpus delicti must be proved independently of confessions. But we do not understand such to be the better doctrine. In other words, in the establishment of the corpus delicti the confessions are not to be excluded, but are to be taken in connection with the other facts and circumstances in evidence. See note 3 to case of State v. Williams, reported in 78 Am. Dec., p. 248. And this rule is recognized in this State. See Jackson v. State, 29 Texas Crim. App., 458. Said case quotes with approval an excerpt taken from 4 Amer. & Eng. Ency. of Law, p. 309, as follows: 'A confession is sufficient, if there by such extrinsic corroborative circumstances as will, taken in connection with the confession, produce conviction of the defendant's guilt in the minds of a jury beyond a reasonable doubt.' 'Such suppletory evidence need not be conclusive in its character. When a confession is made, and the circumstances therein related correspond in some points with those proven to have existed, this may be evidence sufficient to satisfy a jury in rendering a verdict asserting ·the guilt of the accused. Full proof of the body of the crime, the corpus delicti, independently of the confessions, is not required by any of the cases; and in many of them slight corroborating facts were held sufficient. 3 Am. & Eng. Ency. of Law, p. 447. We take it that there can be no question that the prosecution is permitted to prove by circumstantial evidence the corpus delicti, and in aid thereto use confession of the appellant." It is unnecessary to cite further cases or to further discuss the question. In our opinion the record does not cast any kind of suspicion that the confession of the appellant introduced in evidence was other than freely made, without compulsion or persuasion, and that it in every way was legal and complete. It, of itself, aided as it is by many of the uncontroverted corroborating facts and circumstances shown by the record in this case, shows without any doubt whatever, the guilt of the appellant.

The judgment will, therefore, be affirmed.

*Affirmed.*

[Rehearing denied February 28, 1912.—Reporter.]